# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America<br><br>v.<br><br>MUHAMMAD A. CHEEMA<br><br>*Defendant* | Case No. 18-MJ- 626 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the date of <u>January 2012 through July 2017</u> in the county of <u>Monroe</u> in the Western District of New York, the defendant violated <u>18</u> U.S.C. §§ <u>1035 & 1347</u>, offenses described as follows:

the defendant has violated Title 18, United States, Code, Section 1347, *Health Care Fraud*, in that between January 1, 2012 and July 11, 2017, within the Western District of New York, he did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud, obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Excellus and MVP, health care benefit programs as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, and payment for health care benefits, items, and services, and the defendant has violated Title 18, United States, Code, Section 1035, *Making False Statements Relating to Health Care Matters*, in that between January 1, 2012 and July 11, 2017, within the Western District of New York, he did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations to include submitting false billing statements for services never rendered, in connection with the delivery of, or payment for health care benefits, items, and services involving Excellus and MVP, health care benefit programs as defined in 18 U.S.C. § 24(b).

This criminal complaint is based on these facts:

X   Continued on the attached sheet.

Please see attached affidavit

*Complainant's Signature*

Kristin M. Gibson, S/A FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 25, 2018

*Judge's signature*

City and State:   Rochester, New York         Hon. Jonathan W. Feldman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

STATE OF NEW YORK   )
COUNTY OF MONROE   )   SS:
CITY OF ROCHESTER   )

I, Kristin M. Gibson, being duly sworn, do depose and say:

### INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been employed in that capacity for approximately 3 years. I am currently assigned to the FBI's Buffalo Division, Rochester Resident Agency. During the course of my employment with the FBI, I have received specialized training in, and have participated in, criminal investigations involving violations of federal health care laws and associated crimes.

2. I have been involved in the investigation of Muhammad A. Cheema, M.D., a psychiatrist licensed by the State of New York. As set forth below, the investigation has revealed that Dr. Cheema devised and participated in a scheme to defraud a health care benefit program in violation of Title 18, United States Code, Section 1347, and making false statements relating to a health care matters, Title 18, United States Code, Section 1035.

3. This affidavit is made in support of a criminal complaint charging Dr. Cheema with violations of Title 18, United States Code, Sections 1347, and 1035 (hereafter referred to as the SUBJECT OFFENSES). The information contained in this affidavit is based upon my personal knowledge, as well as information I have received from my discussions with and review of reports of other law enforcement officers, health care insurers, and other witnesses. I have not included herein each and every fact known to me concerning this investigation. Rather, I have set forth only those facts necessary to establish that there is probable cause to believe that Dr. Cheema did commit the Subject Offenses.

### PROBABLE CAUSE

**Pertinent Background Information**

4. Dr. Cheema is a licensed psychiatrist who maintains a private practice, known as Upstate Psychiatry, at 115 Sully's Trail, Suite 4, Pittsford, New York, at which he provides outpatient psychiatric services. He has been at this location since approximately February of 2017. Previously, from about 2011 through February of 2017, Dr. Cheema's practice was located at Fairport Psychiatry, 1387 Fairport Rd, Suite 580, Fairport, NY 14450. In addition to his private practice, Dr. Cheema has been employed at Rochester Regional Health, various nursing homes, and has participated in numerous speaking and consulting engagements for pharmaceutical companies.

**Health Care Benefit Programs**

5. The term "health care benefit program" is defined in 18 U.S.C. § 24(b) to mean any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

6. Excellus BlueCross BlueShield ("Excellus"), MVP Health Care ("MVP"), Cigna, United Health ("United"), and Aetna are private health care insurance companies doing business in the Western District of New York. Medicare is a national social insurance program administered by the United States federal government. Excellus, MVP, Cigna, United, Aetna, and Medicare contract with health care providers, including psychiatrists, to pay the health care providers for certain medically necessary medical services and treatments actually rendered to individuals covered by these entities, and as such are "health care benefit programs." Henceforth and for the purpose of this affidavit, Excellus, MVP, Cigna, United, Aetna, and Medicare will be referred to as "health care benefit programs."

**Health Insurance Claim Form / HCFA 1500**

7. Based on my training and experience, I know that physicians submit reimbursement requests for medical services to health care benefit programs on a standard form known as a Health Insurance Claim Form, or Form HCFA 1500. Each claim for reimbursement on a HCFA 1500 must be signed by the physician, and describe among other things: the diagnosis; date of service; procedure code; type of service or services provided by the physician; charges; and the name of the physician providing the service or services. The physician is required to sign the HCFA 1500 and "certify that the services shown on this form…were personally furnished by me…". The HCFA 1500 claim form can be submitted by either a standard paper claim form that is mailed, or electronically.

8. Health care benefit program insurers process the HCFA 1500 claim submissions by qualified providers. They process these claims, and then pay the health care provider for the amount of any covered service rendered, as claimed on the HCFA 1500 claim form, which is signed and certified by the provider. The health care benefit programs rely on the accuracy and truthfulness of the information contained in the HCFA 1500 claim forms in processing and paying providers for services rendered to patients.

**Medical Records Requirement**

9. Based on my training and experience, I know that physicians and other providers are required by contract and by regulation to maintain written medical records for all patients. Such medical records must accurately and truthfully describe, among other things, patient histories, pertinent findings, examination results, test results, lab results, and treatment rendered to patients.

10. Among other purposes, written medical records provide documentary support for the HCFA 1500 claim forms submitted by a provider. A medical record must accurately reflect the physician's medical diagnosis and support the level of service or treatment provided to the patient. If the medical provider's notes in a medical record do not support the level of service provided, or adequately describe the service provided, then the claim for payment for that service can be denied by the health care benefit program.

11. Two main types of medical records exist in mental health practice. One type of record kept is basic records, also known as progress notes. Progress notes are part of the patient's record or file and usually follow a standardized format, such as SOAP (Subjective, Objective, Assessment, and Plan). The progress notes include details of the patient's symptoms, assessment, diagnosis, and treatment, including documentation of how the medical provider addressed crisis issues and processed them. The progress notes also allow the medical provider to compare a patient's past and current status, communicate findings and allow review of case details. If psychotherapy is provided to a patient, then the progress notes must designate the time spent on providing psychotherapy.

12. The other type of medical records that exist in mental health practice are psychotherapy notes. Psychotherapy notes are documentation or analysis of the contents of conversation that occurred during a private counseling session or a group, joint, or family counseling session. Psychotherapy notes exclude medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date. HIPAA protections for psychotherapy notes include the provision that they remain separate from the patient's main record.

**Current Procedural Terminology (CPT) Codes**

13. Medical services and procedures provided are represented in coded numerical form on the HCFA 1500 insurance claim. Based on my training and experience, I know that these service and procedure codes are listed and described in detail in the "Current Procedural Terminology" ("CPT") manual, a national standard reference and coding manual published by the American Medical Association in order to provide a uniform language to accurately describe medical, surgical and diagnostic services.

14. These service and procedure codes are commonly referred to as "CPT codes," and identify the nature and complexity of the services provided by the physician. In 2000, to implement the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Department of Health and Human Services designated the CPT code set as the national coding standard for physicians and other health care professional services and procedures. As a result, for all financial and administrative health care transactions, CPT codes must be used in describing health care services rendered. In addition, based on my training and experience, I know that health care benefit programs contractually require health care providers to use CPT codes in submitting reimbursement claims.

3

15. Health care providers submitting claims to health care benefit programs for reimbursement also must provide their diagnosis for the patient on the claim forms. A diagnosis is the name given to a patient's disease or condition, as determined by a physician, and is used to determine whether a prescribed treatment or therapy is medically necessary and appropriate. Based on my training and experience, I know that numerical codes for diagnoses are contained in the Manual of International Classification of Diseases, 10th Edition ("ICD-10 Manual"), the national standard for the health care industry. Health care providers seeking reimbursement determine which diagnosis code in the ICD-10 Manual corresponds to the patient's condition for which services are being rendered, and places that code on the claim form.

16. Based on my training and experience, I know that some psychiatry services, such as psychotherapy, may be reported in conjunction with evaluation and management ("E/M") services, when performed. E/M services include the assessment, counseling, and pharmacological management provided to a patient. E/M services may also be reported alone for the treatment of psychiatric conditions, rather than using a psychiatry services code such as psychotherapy, when minimal or no associated psychotherapy is provided.

17. There are several categories and subcategories of E/M services defined in the CPT manual. Each category represents a specific type of E/M, such as an "Office or Other Outpatient Service." Within each of these categories there are subcategories that define the type and extent of the service provided with more specificity. Under each of these subcategories, there are three to five levels of E/M services available for billing purposes. For example, the subcategories of "Office or Other Outpatient Services" would include "New Patient" (CPT codes 99201 through 99205) and "Established Patient" (CPT codes 99211 through 99215).

18. The components of an E/M service are defined in the CPT to include: history, physical examination, medical decision making, counseling, coordination of care, nature of presenting problem, and time. The first three components (history, physical examination, and the medical decision making) are considered the key components in selecting the appropriate level of E/M services. The next three components (counseling, coordination of care, and nature of presenting problem) are considered contributory factors in the level of E/M services, but are not required to be provided at every patient encounter. The final component, the amount time spent with patient, is utilized in selecting the most appropriate level of E/M services, and includes range of times depending on the actual clinical circumstances.

19. CPT code 99213 is for the evaluation and management of an established patient, which requires at least 2 of the following 3 key components:

      (a) An expanded problem focused history;
      (b) An expanded problem focused examination;
      (c) Medical decision making of low complexity.

4

Usually the presenting problem(s) are of low to moderate severity, and a minimum of 15 minutes are spent face-to-face with the patient and/or family.

20. CPT code 99214 is for the evaluation and management of an established patient, which requires at least 2 of the following 3 key components:

        (a) A detailed history;
        (b) A detailed examination;
        (c) Medical decision making of moderate complexity.

Usually the presenting problem(s) are of moderate to high severity, and a minimum of 25 minutes are spent face-to-face with the patient and/or family.

**Psychiatry CPT Codes**

21. Based on my training and experience, I know that psychotherapy is the treatment of mental illness and behavioral disturbances in which a physician or other qualified health care professional, through therapeutic communication, attempts to alleviate emotional disturbances, reverse or change maladaptive patterns of behavior, and encourage personality growth and development. Psychiatry services include diagnostic services, psychotherapy, and other services to an individual, family, or group. Health care benefit programs reimburse for covered services only if those services are medically and reasonably necessary, and not otherwise excluded from coverage.

22. The psychotherapy CPT codes used to document treatment are 90832 through 90838. Psychotherapy times are for face-to-face services with the patient and family member, if present.

23. To bill psychotherapy services, the provider should choose the CPT code closest to the actual time spent with the patient and/or family member. CPT codes 90832 and 90833 are for 30 minute face-to-face sessions (covering an actual time range of 16-37 minutes). CPT codes 90834 and 90836 are billed for 45 minute face-to-face sessions (covering an actual time range of 38-52 minutes). CPT codes 90837 and 90838 are billed for 60 minute face-to-face sessions (covering an actual time range of 53 minutes or more).

24. Some psychiatric patients receive E/M services on the same day as a psychotherapy service by the same physician. In order to report and claim reimbursement for both E/M and psychotherapy services, the two services must be significant and separately identifiable. The type and level of E/M service is selected first based on the key components of history, examination, and medical decision making. Then specific psychotherapy service codes are to be selected. These psychotherapy codes are called "add-ons." The "add-on" CPT codes to be used with an E/M service code are 90833, 90836, or 90838. The E/M service cannot be billed based on the time spent in psychotherapy, and the time associated with activities used to meet criteria for the E/M service may not to be included in the psychotherapy time. In other words, a

5

physician may not double-count the time spent with a patient to support a claim for reimbursement for both E/M and psychotherapy services.

25. Not all psychiatric patients require an E/M service at the same time that they receive psychotherapy care, and in such circumstances it is correct to bill for psychotherapy services only by selecting an appropriate CPT code, such as 90832, 90834, or 90837. Conversely, if only minimal psychotherapy is provided at an E/M visit, it is correct to bill an E/M service code alone.

**Allegations Concerning Health Care Fraud**

26. Dr. Cheema, a licensed physician in New York State since 2004, provides psychiatric services at his private practice, Upstate Psychiatry, Monday through Friday. Dr. Cheema is paid for services he provides at his private practice through various health care benefit programs, patient co-payments and deductibles, and cash or checks.

27. Dr. Cheema has also provided psychiatric services at Rochester Regional Health approximately 20 hours per week, and various nursing homes during the week and on the weekends. In addition, Dr. Cheema has performed many consulting and speaking engagements for pharmaceutical companies throughout the United States which requires significant travel.

28. The investigation into Dr. Cheema began when the FBI learned from Excellus that he had routinely and systematically changed office visit billing codes, billed insurance companies for telephone appointments as office visits, and regularly had 30 or more patients on his daily schedule. Dr. Cheema's daily private practice office hours were 11:00 a.m. to 5:00 p.m. An audit conducted by Excellus on eight (8) patients for a six (6) month time period in 2015 revealed an overpayment of 54% to Dr. Cheema in relation to services not rendered and upcoding of office visits. Dr. Cheema routinely billed the highest level of E/M services for new patient visits, and his medical notes were missing the documentation to support the level of E/M services for his established patients.

29. The FBI obtained billing records from Excellus, and an analysis of claims data from January 2013 to December 2015 disclosed approximately 81 days that Dr. Cheema exceeded ten (10) hours of billed office visit time for Excellus' members alone. This analysis did not include billing from any other health care benefit program.

30. In addition to his private practice and as reported by the Centers for Medicare & Medicaid Services (CMS) through Open Payments, Dr. Cheema has been paid over $855,000 by multiple pharmaceutical companies for 341 promotional speaking engagements and 62 consulting opportunities from August 2013 to December 2016. Open Payments is a national program that collects and publishes information concerning financial relationships between the health care industry and providers. In 2016, Dr. Cheema was well above the national mean of compensation provided to a psychiatric provider by $226,163.97. The national mean paid to a psychiatric provider (out of 17,053 psychiatric providers nationwide) for 2016 was $2,925.95.

31. Billing records from multiple private and government insurance companies were requested. An analysis of the records from the health care benefit programs was conducted and demonstrated that, in the vast majority of instances, Dr. Cheema billed for E/M services plus an "add-on" psychotherapy code.

32. A pattern analysis was conducted by Excellus ranking Dr. Cheema among all his peers who billed Excellus for psychiatry services. The data ranked psychiatrists, who billed Excellus in Western New York and the surrounding areas, by the amount of times certain CPT codes were utilized. The CPT codes analyzed were 99213, 99214, and 90833 for the time period of January 1, 2016 through December 31, 2016.

    (a) CPT 90833: Dr. Cheema ranked the 2nd highest biller of this code out of 287 psychiatrists;
    (b) CPT 99213: Dr. Cheema ranked the 7th highest biller of this code out of 434 psychiatrists;
    (c) CPT 99214: Dr. Cheema ranked the 17th highest biller of this code out of 403 psychiatrists.

**Video Surveillance of Dr. Cheema's Private Practice**

33. On December 7, 2017, surveillance of Dr. Cheema's medical practice was initiated. This included video surveillance. Video surveillance occurred in the rear of the office complex focusing on the employee entrance to the building. The video surveillance was conducted in such a way that it would not record or capture any patients entering the practice, but would instead be able to record Dr. Cheema entering the parking lot, parking his car, and entering and exiting his office.

34. Analysis of the video surveillance was conducted on multiple days over several months. The video footage documented Dr. Cheema's arrival and departure from the practice. The FBI reviewed Dr. Cheema's patient schedule and billing records for the time period of the video surveillance and compared his actual time in the office with the number of patients he billed in a given day. That comparison showed that Dr. Cheema falsely reported the time he spent seeing patients and the actual time with patients was not long enough for Dr. Cheema to provide basic medical services (medical history, physical examination, and psychotherapy) necessary to support the matters being billed.

35. A representative sample for three days is produced below.

**December 14, 2016 – Surveillance & Billing Analysis**

36. On December 14, 2016, video surveillance showed Dr. Cheema entering his private practice at 10:57 am and exiting the private practice at 4:59 pm, for a physical total of 6 hours and 2 minutes at his practice.

37. On that same date, Dr. Cheema's schedule documented that he saw and billed for 25 individual patients. The average amount of time Dr. Cheema could spend with 25

7

individuals during the 6 hours and 2 minutes that he was present would be 14 minutes per person, provided he spent every minute face-to-face with a patient. This does not take into consideration any other normal interruptions that are typical in the office environment to include writing medical notes. Analysis of the physical surveillance, scheduling documents, and billing records show that Dr. Cheema repeatedly billed for patient treatment time and patient medical services which he never provided.

38. A review of Dr. Cheema's schedule and billing show that insurance claims were submitted on 25 individuals for December 14, 2016. The billing codes utilized for 23 of the 25 visits was CPT codes 99213 or 99214 together with psychotherapy "add on" 90833. Patient 24 was billed only CPT code 99213, and patient 25 was billed only CPT code 99214.

39. The amount of time Dr. Cheema spent with 23 individuals using CPT code 99213 or 99214 along with an add-on psychotherapy CPT code (90833) does not meet the billing requirements. Indeed, psychotherapy CPT code 90833 alone requires a minimum of 16 minutes spent face-to-face with the patient. The minimum 16 minutes would be in addition to the necessary time it would take to meet the key requirements for CPT codes 99213 or 99214.

40. In addition, the 1 individual Dr. Cheema billed for CPT code 99214 without the "add on" code does not meet the minimum billing requirements for that service. CPT code 99214 requires a minimum of 25 minutes face-to-face time with a patient.

**December 15, 2016 – Surveillance & Billing Analysis**

41. On December 15, 2016 video surveillance showed Dr. Cheema entering his private practice at 11:06 am and exiting at 4:41 pm, for a physical total of 5 hours and 35 minutes at his practice.

42. On that same date, Dr. Cheema's schedule documented that he saw and billed for 22 patients. The average amount of time Dr. Cheema could spend with 22 individuals during the 5 hours and 35 minutes that he was present would be 15 minutes per person, providing he spent every minute face-to-face with a patient. This does not take into consideration any other normal interruptions that are typical in the office environment to include writing medical notes. Analysis of the physical surveillance, scheduling documents, and billing records show that Dr. Cheema repeatedly billed for patient treatment time and medical services which he never provided.

43. A review of Dr. Cheema's schedule and billing claims show that insurance claims were submitted on 21 individuals and 1 individual was a self-pay for December 15, 2016. The billing codes utilized for 19 of the 21 billed visits was CPT codes 99213 or 99214 together with psychotherapy "add on" 90833. Patient 20 was billed CPT code 90791, and patient 21 was billed CPT code 99213. Patient 22 was a self-paying patient.

44. The amount of time Dr. Cheema spent with the 19 individuals using CPT code 99213 or 99214 along with an add-on psychotherapy CPT code (90833) does not meet the

8

billing requirements. Indeed, psychotherapy CPT code 90833 alone requires a minimum of 16 minutes spent face-to-face with the patient. The minimum 16 minutes would be in addition to the necessary time it would take to meet the key requirements for CPT codes 99213 or 99214.

45. Dr. Cheema's schedule also noted that 7 of the billed visits utilizing CPT code 99213 with 90833 were telephone appointments. CPT codes 99213 with "add on" code 90833 require a face-to-face office visit and a telephone call would not meet the requirement for either code. There are other billing codes eligible for telephone calls with patients.

**January 11, 2017 – Surveillance & Billing Analysis**

46. On January 11, 2017 video surveillance showed Dr. Cheema entering his private practice at 10:06 am and exiting the private practice at 11:18 am. Dr. Cheema returned to his private practice at 1:38 pm and exited the private practice at 5:11 pm for a combined physical total of 4 hours and 42 minutes at his practice.

47. On that same date, Dr. Cheema's schedule documented that he saw and billed for 19 patients. The average amount of time Dr. Cheema could spend with 19 individuals during the 4 hours and 42 minutes that he was present would be 14 minutes per person, providing he spent every minute face-to-face with a patient. This does not take into consideration any other normal interruptions that are typical in the office environment to include writing medical notes. Analysis of the physical surveillance, scheduling documents, and billing records show that Dr. Cheema repeatedly billed for patient treatment time and patient medical services which he never provided.

48. A review of Dr. Cheema's schedule and billing claims show that health care benefit programs were billed for 18 individuals and 1 individual was self-pay for January 11, 2017. The billing codes utilized for 16 of the 18 billed visits was CPT codes 99213 or 99214 together with psychotherapy "add on" 90833. Patient 17 was billed CPT new patient code 99205, and patient 18 was billed for a psychiatric diagnostic evaluation, CPT code 90791. Patient 19 was a self-paying patient.

49. This amount of time does not meet the billing requirement to use a CPT code for an E/M service (99213 or 99214) along with an add-on psychotherapy CPT code (90833). Indeed, psychotherapy CPT code 90833 alone requires a minimum of 16 minutes spent face-to-face with the patient. The minimum 16 minutes would be in addition to the necessary time it would take to meet the key requirements for CPT codes 99213 or 99214.

50. Furthermore, the 1 individual Dr. Cheema billed for CPT code 99205 does not meet the minimum billing requirements for that service. CPT code 99205 requires a minimum of 60 minutes face-to-face time with a patient.

**Fraudulent Billings Related to the Undercover Agent**

51. During the course of this investigation, an FBI undercover agent ("UC") posed as a patient seeking psychiatric services on six (6) occasions from Dr. Cheema. The undercover agent utilized an Excellus insurance card to pay for his visits along with a cash co-payment of $25.00. The UC wore a covert audio and video recording device during his contacts with Dr. Cheema.

52. The UC's first in person contact with Dr. Cheema lasted approximately 20 minutes. At no point did Dr. Cheema perform any physical examination or provide any psychotherapy. Despite this, Dr. Cheema prescribed Bupropion and Trazodone to the UC.

53. Subsequent in person appointments on other dates with Dr. Cheema lasted 10 minutes, 5 minutes, 14 minutes and 6 minutes. At no point during any of these appointments did Dr. Cheema perform any physical examination or provide any psychotherapy. However, he did change the UC's medications several times. Dr. Cheema also conducted one phone appointment with the UC which lasted 3 minutes. No psychotherapy was provided during that call.

54. A review of the billing records submitted to Excellus for services provided by Dr. Cheema related to the appointments with the UC show that Dr. Cheema falsely billed Excellus for these sessions related to the duration and the nature of the treatment provided.

55. Agents obtained and reviewed the UC's medical records prepared by Dr. Cheema during this investigation pursuant to a federal search warrant. A review of the medical records Dr. Cheema prepared following 5 of the 6 clinical appointments with the UC showed that Dr. Cheema falsified medical records and notes related to those appointments to support the false billing claims submitted to Excellus. Specifically, the medical records document a specified treatment time and also claim that specific therapeutic treatment modalities were provided to the UC during the appointments. UC covert video recordings show that these therapeutic methods were never provided and that the UC was not in Dr. Cheema's office for the time listed in the medical records. In addition, there was no medical record or progress note for one of the appointments, and the medical record for the telephone appointment was listed as an "office visit" and included documentation pertaining to a physical examination which could only be completed in person.

56. The UC covert video recordings also showed that during most of the in person sessions, that Dr. Cheema sat behind his desk working on his computer, made little eye contact with the UC, and did not perform any physical examinations of the UC.

**Fraudulent Billings**

57. A statistically-valid random sample of 71 of Dr. Cheema's patients was obtained, consisting of those patients with health insurance that Dr. Cheema accepted and billed.

10

Interviews of patients were conducted, and medical records and billing claims submitted by Dr. Cheema were reviewed for the patients in the sample. This review showed in the majority of instances, Dr. Cheema improperly billed the health care benefit programs for services that he did not provide.

58. Set forth below are a few illustrations of findings based on the interviews conducted, and review of the medical records and billing records.

**Fraudulent Billing Related to Sample Patient 1**

59. Sample Patient 1 ("SP1"), with insurance through MVP, was seen by Dr. Cheema from July 2012 to November 2016 for a total of 44 appointments. SP1 was interviewed by law enforcement on February 14, 2018. SP1 stated his appointments with Dr. Cheema lasted approximately 5 minutes and that Dr. Cheema would act like he didn't care about him during the appointments. Dr. Cheema never looked SP1 in the eye, would always be looking at his cellular telephone, and would take telephone calls from other patients during his appointments. SP1 believed Dr. Cheema took a medical history from him at one time, but never performed a physical examination, took a blood pressure, or provided psychotherapy. SP1 only went to Dr. Cheema for medication management.

60. Dr. Cheema submitted billing claims to a health care benefits program in connection with the services allegedly provided to SP1, whose visits represent only a portion of all the claims submitted by Dr. Cheema. Review of these records show that Dr. Cheema provided false billing claims to MVP Health. Specifically, Dr. Cheema improperly billed MVP as to the time he spent with SP1; the nature of the services he provided to SP1; and the therapeutic treatment he provided to SP1. Review of Dr. Cheema's patient charts also showed false documentation related to the care and treatment of SP1. In addition, there were multiple in office billings for dates of services where no medical records existed in the chart except for the documentation of medications on SP1's medication log for those dates of service. Also, in some instances SP1's medical record documented "patient reports doing well," however Dr. Cheema would bill for a high level CPT code 99214 which is utilized for a patient who required a higher level of care.

**Fraudulent Billing Related to Sample Patient 2**

61. Sample Patient 2 ("SP2"), with insurance through Excellus, was seen by Dr. Cheema from March 2012 to March 2017 for a total of 21 appointments. SP2 was interviewed by law enforcement on January 9, 2018 and June 27, 2018. SP2 stated his first appointment with Dr. Cheema lasted quite a while, but the rest of appointments lasted anywhere from 7 minutes to 15 minutes at the most. SP2's appointments with Dr. Cheema were for medication management only, and Dr. Cheema never performed a physical examination nor provided psychotherapy. Dr. Cheema never took a blood pressure, checked his heart rate or took his temperature at any of his visits. SP2 stated if he wanted a psychotherapy session, Dr. Cheema would have referred him to

someone else. SP2 and SP2's family had increasing concerns regarding the prescribed medications and the care he was receiving from Dr. Cheema.

62. Dr. Cheema submitted billing claims to a health care benefits program in connection with the services allegedly provided to SP2, whose visits represent only a portion of all the claims submitted by Dr. Cheema. Review of these records show that Dr. Cheema provided false billing claims to Excellus. Specifically, Dr. Cheema improperly billed Excellus as to the time he spent with SP2; the nature of the services he provided to SP2; and the therapeutic treatment he provided to SP2. Review of Dr. Cheema's patient charts also showed false documentation related to the care and treatment of SP2, including at least five medical records that appeared to have been altered to include false vital signs and psychotherapy notes. In addition, SP2's medical record would document "patient reports doing well," however Dr. Cheema would bill for a high level CPT code 99214 which is utilized for a patient who required a higher level of care.

**Fraudulent Billing Related to Sample Patient 3**

63. Sample Patient 3 ("SP3"), with insurance through Excellus, was seen by Dr. Cheema from August 2012 to April 2017 for a total of 26 appointments. SP3 was interviewed by law enforcement on December 4, 2017. SP3 stated her appointments with Dr. Cheema lasted approximately 5 minutes and were pointless. During the appointment time, Dr. Cheema would be texting on his cellular telephone or typing on his computer. Dr. Cheema would be doing other things unrelated to her care. Dr. Cheema has never performed a physical examination nor provided psychotherapy to SP3.

64. Dr. Cheema submitted billing claims to a health care benefits program in connection with the services allegedly provided to SP3, whose visits represent only a portion of all the claims submitted by Dr. Cheema. Review of these records show that Dr. Cheema provided false billing claims to Excellus. Specifically, Dr. Cheema improperly billed Excellus as to the time he spent with SP3, the nature of the services he provided to SP3, and the therapeutic treatment he provided to SP3. On multiple occasions SP3's medical record would document "patient reports doing well," however Dr. Cheema would bill for a high level CPT code 99214 which is utilized for a patient who required a higher level of care. In addition, Dr. Cheema billed for dates of services where the medication log indicated "no show," and there were no other medical records or progress notes located for those dates in SP3's chart.

**Fraudulent Billing Related to Falsified/Altered Medical Records**

65. In the ordinary course of its business, Excellus conducts random audits of health care claims submitted by treatment providers. One such audit was conducted on a claim submitted to Excellus by Dr. Cheema in 2016 involving one of his patients. The audit identified missing medical documentation, specifically identifying a missing lab report.

66. On 3/21/2016, Dr. Cheema submitted a University of Rochester Medical Center ("URMC") lab report to Excellus in support of his claim for payment for an office

visit. However, upon review of the laboratory report submitted by Dr. Cheema, Excellus noted the report looked suspicious as the font used for the date of collection did not appear to match the font of the surrounding information provided in the document. The date of collection on the URMC laboratory report received from Dr. Cheema was "4/20/2015." No claims were found in Excellus' billing system to match this date of service for the member. Excellus contacted the URMC Billing Office and confirmed that URMC had no records on file for the member for this date of service.

67. Further examination of the URMC laboratory report revealed that the patient's date of birth did not correlate accurately with the correct age of the patient on the date of service. Excellus contacted URMC's Billing Office again, and verified that the actual date the laboratory testing was completed was on 4/9/2013. Excellus' claim history verified that a claim was paid for the member for the 4/9/2013 date of service.

68. Excellus obtained a copy of the 4/9/2013 laboratory report directly from URMC. The format of the report received from URMC did not match the one-page results received from Dr. Cheema. Excellus also obtained a copy of the 4/9/2013 laboratory report from the member's Primary Care Physician ("PCP"). The format of the report received from the PCP also did not match the one-page results received from Dr. Cheema.

69. During this investigation, a search warrant was executed on digital computer equipment owned by Dr. Cheema. A forensic examination of one of the computers located a document with the file name Scan_20160317.png in the folder labeled "Pictures," with a create date of March 18, 2016. A review of the image identified this as the aforementioned original laboratory results of the Excellus member.

**Other Fraudulent Patient Records**

70. On or about October 2015, Excellus randomly selected several patients of Dr. Cheema's for a routine audit. Excellus contacted Dr. Cheema's practice who indicated that Dr. Cheema was out of the area at the time. In his absence, members of Dr. Cheema's staff copied the requested records from the patient's medical charts and forwarded them to Excellus. Upon review, Excellus noted for some of the patient's dates of services there were no correlating medical records or progress notes in the charts, and documentation was insufficient to warrant the billing codes submitted by Dr. Cheema. As a result of their findings, Excellus either down coded billings not supported by documentation or denied claims where there was no documentation at all. Since these claims had been previously submitted by Dr. Cheema, Excellus sent a letter to Dr. Cheema regarding potential repayment.

71. On or about March 6, 2016, Dr. Cheema sent Excellus a letter referring to the audit results. In the letter Cheema explained that during the audit he was out of the country. The letter further explained that Dr. Cheema hand writes his notes while seeing patients and the new evaluations are then transcribed and electronically faxed to the referring provider. Dr. Cheema went on to explain that some of the requested transcribed records were in his laptop and unable to be sent. Along with the letter Cheema sent Excellus the missing transcribed initial evaluations and progress notes

that were not sent by "mistake." Dr. Cheema also reiterated that he spends a good amount of time with each patient and therefor requested Excellus not down code the patients. Dr. Cheema submitted 3 typed "Psychiatric Evaluations" and 6 hand written "evaluation/Management +Psychotherapy" notes.

72. Excellus conducted a follow up review of the new medical records received by Dr. Cheema on March 14, 2016. Based on statements made in the aforementioned medical records Excellus again requested further records from Dr. Cheema's office on March 17, 2016. These additional records should have supported statements in the 3 typed "Psychiatric Evaluations" and also claims made directly to Excellus by Dr. Cheema. The results or the review are as follows:

   a. The Primary Care Physicians (PCP) were contacted for the 3 patients whom Dr. Cheema sent in the typed "Psychiatric Evaluations." This was done in order to verify Dr. Cheema's statement in his aforementioned letter where he stated he, "electronically faxed to the referring provider." Two of the patients PCP's stated they had no record of any notes received from Dr. Cheema, another patient's listed PCP stated they had never seen that patient.
   b. In all three typed medical records, Dr. Cheema stated that he reviewed labs and also ordered additional tests for each patient. Excellus noted the following: for two of the patients Excellus was unable to verify the validity of the laboratory results submitted by Dr. Cheema because they were missing patient demographic information, for two of the patients no billing claim records existed for the dates of service listed on the laboratory result, one patient's lab results were dated December 10, 2010, and one of the patients laboratory was confirmed to be modified and not ordered by Dr. Cheema in 2015, as mentioned previously in this affidavit.
   c. In addition, despite the medical record reflecting that Dr. Cheema ordered sleep studies, Excellus indicated that Dr. Cheema never requested any pre authorizations at any point for the sleep studies of these patients.

73. Agents reviewed multiple medical records of Dr. Cheema's patients throughout the course of this investigation and did not find any typed "Psychiatric Evaluations" similar to the three submitted to Excellus in any of Dr. Cheema's patients medical charts that were reviewed. Typed electronic records did not begin until Dr. Cheema switched to electronic medical records in 2017.

74. During the forensic examination of the computers seized in this investigation, the typed "Psychiatric Evaluations" of one of the patients submitted to Excellus was located on Dr. Cheema's computer. The files showed they were created in 2016, after the Excellus audit and as much as a year after the actual patient contact.

75. Among the 6 hand written records referenced above submitted by Dr. Cheema was a medical record for Sample Patient, SP2. The medical record submitted to Excellus by Dr. Cheema on March 14, 2016 was compared to the medical record in SP2's medical chart seized in the search warrant on August 3, 2017. Both records list the same date of service, however the record found in the medical chart as of August 3, 2017, had

added information such as vital signs, and psychotherapy time. This further supports evidence of Dr. Cheema altering medical records more than a year after the visit was conducted and also adding false vital signs which were not taken during the visit in 2015.

76. On December 12, 2016, the internet history of Cheema's desktop computer showed that he visited the website www.google.com and conducted searches for the terms inpatient+psychiatry+audit+some+notes+are+missing.

77. On a regular basis, and on the behalf of Dr. Cheema the office staff would submit the HCFA 1500 form to the Health Care Benefit Programs. Dr. Cheema provided the necessary information to the office staff or biller to complete the form and therefore knowingly caused false claims for reimbursement to be submitted via HCFA 1500 forms. Each form contained language, certifying the accuracy of the submitted information, and each submitted form was material to the Health Care Benefit Program to which it was submitted. Each of the Health Care Benefit Programs relied upon the accuracy of these forms in paying Cheema for the claims

**Fraudulent Board Certification Documents**

78. In order for Dr. Cheema to remain a participating provider with Excellus and to continue to be reimbursed for billing claims he submitted, Excellus required Dr. Cheema to be board certified in Psychiatry. If he was not board certified, Dr. Cheema could no longer remain a participating provider and submit billing claims to Excellus.

79. On April 3, 2017, Dr. Cheema submitted proof of board certification to Excellus from the American Board of Psychiatry and Neurology ("ABPN") showing Dr. Cheema to be board certified in Psychiatry for the time period September 2016 to December 31, 2026. However, this document was fraudulent.

80. ABPN has confirmed Dr. Cheema was not board certified in Psychiatry, has never passed the ABPN certifying examination in Psychiatry or Neurology, and they have never sent Dr. Cheema any version of a valid or sample ABPN certificate. Upon certification with ABPN, a physician is given a unique identifying number which is included on any certification documents. ABPN has seen and reviewed the certificate presented to Excellus by Dr. Cheema, and has affirmed the certificate presented by Dr. Cheema was an altered or falsified version of a valid certificate issued to a different medical provider.

81. The forensic examination of the digital equipment seized from Dr. Cheema yielded the following results:

    a. On December 6, 2016, the internet history of the desktop computer showed visits to the website www.google.com and conducted searches for the terms, "psychiatry + board + pass + letter" and "abpn + passing + letters."

    b. Dr. Cheema's computers also visited websites of a board certified psychiatrist from Arizona which linked to a valid ABPN Certificate with a unique board certification number.

    c. A JPEG file named dimploma3_LI.jpg was located on Dr. Cheema's desktop computer with a created date of December 6, 2016. A review of the image identified it as the valid American Board of Psychiatry and Neurology Certificate belonging to the Arizona psychiatrist with the same unique board certification number.

    d. A JPEG file was located on Dr. Cheema's desktop computer in the "Pictures" folder and labeled ABPN.jpg. The created date of this file was December 6, 2016. A review of the ABPN.jpg image identified it as an American Board of Psychiatry and Neurology Certificate bearing the name *Dr. Muhammad Cheema*, with a date range of September, 2016 - December 31, 2026. This false certificate bore the same unique board certification number as the valid certification belonging to the actual credentialed physician from Arizona.

82. The Forensic Audio, Video and Image Analysis Unit ("FAVIAU"), Digital Evidence Laboratory, Federal Bureau of Investigation, examined the ABPN certificate submitted by Dr. Cheema to Excellus. FAVIAU detected multiple anomalies in the certificate, and determined the name and date on the certificate were digitally manipulated.

83. During the forensic examination of the computers seized in this investigation, a Curriculum Vitae was located on Dr. Cheema's desktop computer and labeled files\cheema(CV).docx. The created date of this file was December 18, 2016. On the Curriculum Vitae under the "Professional Licensure" section was "Board Certification, ABPN".

84. A Curriculum Vitae was located on Dr. Cheema's laptop computer and labeled files\cheema(CV)9.docx. The created date of this file was March 28, 2017, and listed under "Professional Licensure" was "Board Certification, ABPN. A Curriculum Vitae with a similar file name, files\cheema(CV)9(1).docx, was created on May 30, 2017, after Cheema was notified by the ABPN regarding the use of the fake certificate. This Curriculum Vitae had removed the statements pertaining to the ABPN credential.

**Scope of the Fraudulent Activity**

85. Based on the foregoing, and my training and experience, Dr. Cheema defrauded the health insurance programs by improperly billing for services he did not render. In addition to the specific instances set forth above, Dr. Cheema also submitted fraudulent bills for the majority of the patients in the random sample. The results of the statistical sampling and the re-adjudications of claims billed demonstrate the total percentage of fraudulent insurance payments to be 54.79%.

86. Furthermore, beyond the random sample of patients, a review of billing records, medical records, interviews, video surveillance, and undercover operation has shown that a majority of the patients who visited Dr. Cheema did not meet the requirements that would allow Dr. Cheema to bill the CPT codes that he choose to submit to the health care benefit programs. It should be noted that in some instances Dr. Cheema had several other CPT codes available to him that could have properly been billed, but reimbursement for these codes would have been less than the codes that Dr. Cheema chose to bill.

87. Based on my review of the pertinent information collected in this investigation, for the period of January 1, 2012 to July 11, 2017, I estimate that Dr. Cheema submitted approximately $1.8 million in fraudulent claims.

Based upon the forgoing, your affiant respectfully submits that there is probable cause to believe that MUHAMMAD A. CHEEMA has violated Title 18, United States, Code, Section 1347, *Health Care Fraud*, in that between January 1, 2012 and July 11, 2017, within the Western District of New York, he did knowingly and willfully execute and attempt to execute the above-described scheme and artifice to defraud, obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Excellus and MVP, health care benefit programs as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, and payment for health care benefits, items, and services, and

Further, your affiant respectfully submits that there is also probable cause to believe that MUHAMMAD A. CHEEMA has violated Title 18, United States, Code, Section 1035, *Making False Statements Relating to Health Care Matters*, in that between January 1, 2012 and July 11, 2017, within the Western District of New York, he did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations to include submitting false billing statements for services never rendered, in connection with the delivery of, or payment for health care benefits, items, and services involving Excellus and MVP, health care benefit programs as defined in 18 U.S.C. § 24(b).

KRISTIN M. GIBSON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 25 day of July, 2018.

HON. JONATHAN W. FELDMAN
United States Magistrate Judge
Western District of New York

17